GEORGE R. SIMS *et al.*, plaintiffs in error, *vs.* MARTHA SIMS *et al.*, defendants in error.

1. An heir-at-law, before he can claim any part of an estate as distributee, must account for advancements at their value at the time of the advancements.

2. In the distribution of intestate's estate, a memorandum, kept by the parent, of his advancements to his children, indicating a scheme of distribution of specific articles in kind, is only evidence of the fact of the advancements, etc., *prima facie* of their value, and its indications of the intestate's scheme for the distribution of his estate will be unheeded, unless the paper be proven as a will.

3. The *value* of an estate, at the time of the first distribution, is the proper criterion for arriving at the rights of the heirs-at-law, with respect to advancements.

Distribution of estates. Advancements. Decided by Judge WILLIAM M. REESE. Oglethorpe Superior Court. October Term, 1867.

The bill of George R. Sims and Charles W. Sims against the persons herein named, filed in September, 1861, made the following case: John Sims, of said county, died on the ―――― day of ――――, intestate, and complainants became his administrators, and, as such, took possession of his estate.

His heirs and next of kin are Martha Sims, his widow, Isham J. Sims, William G. Sims, Salina Arnold, daughter of intestate and wife of George W. Arnold, three minor children of John M. Sims, deceased, and complainants. But one difficulty in the distribution of the estate is presented. It is this : Intestate, before his death, made advancements of certain property to certain of his children, as follows :

To Isham J. Sims, in December, 1838, three negroes; on the 18th of December, 1847, two other negroes ; on the 26th of December, 1851, two other negroes, and at divers times, other property, consisting of lands, money, etc : to William G. Sims, in December, 1837, three negroes; in December, 1847, two others ; on the 26th of December, 1851, two others, and at divers times, other property: George W. Arnold, in December, 1838, four negroes; in December, 1847, two others, and on the 26th of December, 1851, two others, and at divers times, other property, consisting of lands, etc.: to John M. Sims, in his life-time, in November, 1839, three negroes; in December, 1847, two others; on the 26th of December, 1851, two others, and other property at other times : to George R. Sims, in December, 1847, five negroes ; on the 26th of December, 1851, two others, and other property at divers times. Which advancements are more fully stated in exhibits attached to the bill. No value was affixed by intestate upon any of the advanced property. Charles W. Sims and Martha Sims, having received no advancements, claim that they are entitled to be made fully equal to the other children before any distribution of the estate, and that those who received said negroes, so advanced, should account for their value at the dates of the respective advancements. The children who received the advancements, insist that because of emancipation of the slaves they should not account for the advanced slaves, and that Charles W. and Martha should be made equal to them only as to the other property so advanced.

They prayed that the contesting heirs should interplead and settle this dispute so that complainants might know how to distribute the estate. The exhibits attached to the bill

were copied from intestate's book of advancements, and were as follows:

## NO. 1.

"December, 1838.   I, John Sims, given to my son, Isham J. Sims, two lots of land, No. 5, in the 12th and No. 5, in the 13th District of Monroe county, three negroes; one fellow, 20 or 25 years of age, one girl 16 or 17 years of age, and one boy, 10 years of age; one horse, bridle and saddle, two cows and calves, one thousand (1,000) lbs. pork, bed and furniture.

"Dec'r 18th, 1847.   Two negroes—girl, 11 years of age, boy, 9 years of age.   Also (1600) sixteen hundred dollars in cash in place of land.

"January, 1850.   One thousand dollars.

"Dec'r 26th, 1851.   Two negroes—girl, 10 years of age, boy, 11 years of age; also $1,000 in cash.   I now consider all equal up to this date.

"Sept. 24th, 1853.   Now, I have given ($1,000) and bed and furniture more to my son, Isham J. Sims.

"May 28th, 1858.   Give to my son, I. J. Sims, 1,000 dollars in cash.

"Dec'r 7th, 1859.   Given to my son, I. J. Sims 1,000 dollars in cash.   I now consider all equal up to this date, 1860"

## NO. 2.

"Dec., 1837.   I, John Sims, given to my son, Wm. G. Sims, two lots of land, No. 155 and No. ——, in the 11th District of Troup country, three negroes; fellow, 20 or 25 years of age, girl, 14 or 15 years of age, boy, 12 years of age, one horse, bridle and saddle, two cows and calves, 1,000 lbs. pork, bed and furniture.

"Sept., 1846.   $650 to purchase lot of land from Dr. Phillips.

"Dec. 1847.   Two lots of land, Nos, 156 and 157, in the 11th District of Troup County, in lieu of ($1600) sixteen hundred dollars; two negroes; girl, 11 years of age, boy, 9 years of age.

"Jan., 1850. One thousand dollars in cash.

"Dec. 26th, 1851. Two negroes; girl 9 or ten years of age, boy 12 years of age. I now consider all equal up to this date. Also ($1,000) in cash, given to Wm. G. Sims. One bed and furniture, ($1,000) one thousand dollars. Sept. 24th, 1853.

"Rec'd of John Sims, my father, ($1,000) one thousand dollars. April 30th, 1858. W. G. SIMS.

"Apr. 1860. Given to my son, Wm. G. Sims, one thousand dollars in cash. I now consider all equal up to this date, 1860."

### NO. 3.

"Dec. 1838. I, John Sims, given unto my son-in-law, G. W. Arnold, two lots of land, one in Upson county and one in Talbot county, one negro fellow, 25 years of age, one negro woman, 17 years of age, one negro child, 2 or 3 years of age, one horse, bridle, and saddle, 1,000 lbs pork, 2 cows and calves, bed and furniture.

"Dec. 1847. Sixteen hundred dollars in cash, one negro girl, 11 years of age, and negro boy, 9 years of age.

"Jan., 1850. One thousand dollars in cash.

"Dec. 26th, 1851. Two negroes; girl, 15 years of age, boy, 6 years of age. Also ($1,000) one thousand dollars in cash. I now consider all equal up to this date.

"Given to G. W. Arnold one bed and furniture, and also ($1,000) one thousand dollars. Sept. 24th, 1853.

"Rec'd of John Sims, my father-in-law, $1,000) one thousand dollars. Apr. 30th, 1858. G. W. ARNOLD.

"Apr. 30th, 1860. Given to my son-in-law, G. W. Arnold, one thousand dollars in cash.

"I now consider all equal up to this date, 1860."

### NO. 4.

"Nov. 1839. I, John Sims, given to my son, John M. Sims, two lots of land, Nos. 3 and 33, in 1st District, Coweta county. Also one negro fellow, 25 years of age, one negro fellow, 20 years of age, one girl, 16 years of age, one horse,

bridle, and saddle, 2 cows and calves, one bed and furniture, 1,000 lbs pork.

" Dec., 1847. Two lots of land, No. 31, in the 1st District, and 256, in the 2nd District, Coweta county, in lieu of sixteen hundred dollars, 1 negro girl, 11 years of age, 1 boy, 9 years of age.

" Jan., 1850. $1,000 in cash.

" Dec. 26th, 1851. One negro girl, 14 years of age, boy, 7 years of age. Also ($1,000) one thousand dollars in cash, I now consider all equal up to this date.

" Mar., 1854. I now give my son, John M., ($1,000) one thousand dollars in cash, and one bed and furniture.

" Rec'd of John Sims, my father, ($1,000) one thousand dollars. Apr. 36th, 1868.                JOHN M. SIMS.

" Apr. 30th, 1860. Given to my son, John M. Sims, one thousand dollars in cash.

" I now consider all equal up to this date, 1860."

### NO. 5.

" Dec., 1847. I, John Sims, given to my son, Geo. R. Sims, a settlement of land, lying in Coweta and Fayette counties, containing 976 acres, more or less, five negroes ; one fellow, 25 years of age, one boy, 15 or 16 years of age, one woman and child, one girl, 9 or 10 years of age, one horse, bridle, and saddle, two cows and calves, one bed and furniture, 1,000 lbs. pork.

" Jan., 1850. One thousand dollars in cash.

" Dec. 26th, 1851. Two negroes ; one girl, 15 years of age, boy, 9 years of age. Also ($1,000) one thousand dollars in cash. I now consider all equal up to this date.

" Given to Geo. R. Sims, one bed and furniture, and also ($1,000) one thousand dollars. Sept. 24th, 1853.

" Rec'd of John Sims, my father, ($1,000) one thousand dollars. Apr. 30th, 1858.                G. R. SIMS.

" Given to my son, G. R. Sims, one thousand dollars in cash. I now consider all made equal up to this date, 1860."

George R. Sims answered that the statements, in the bill, were strictly true, with this addition : Martha Sims was the

third wife of the intestate, and by her, the intestate had no children. The negroes owned by her at the date of his said marriage, were kept, by intestate, separate and apart from his own, on the lands of said Martha, and he intended that said Martha should have them at his death, as George R. understood. The advancements, especially of negroes, were intended to be in kind, and not according to value. His scheme was to make his children equal by advancements in kind, and he reserved slave for those children to whom he had not made any advancements, out of whom they might take their equal shares of negroes, and testator had these negroes, as slaves, at his death. Since testator's death, all other things advanced by intestate, have been paid in equal portions to the unadvanced heirs, and, in fact, all the heirs have received equal portions of the estate, and if the advanced heirs shall have to account for the advanced slaves, at the dates of the advancements, the unadvanced heirs will get so much as to make an unequal distribution of the estate. This defendant insists that, because of emancipation, the advancements of slaves should not be counted, and, if the slaves must be brought into hotchpot, they should be put in with all the other slaves of intestate, and the whole estate should be valued at the date of intestate's death, which was before emancipation, and the slaves owned by the intestate, at his death, should be set apart to the unadvanced heirs, till they are equal with the others as to negroes, and then the remnant of the estate should be divided equally. This defendant is informed and believes that intestate told Charles W. Sims he might take his portion of the negroes home, and put them to work. That his scheme was to divide in kind, and that it was so understood, is evidenced by certain receipts on intestate's book of advancements, as follows: " I, Charles W. Sims, hereby acknowledge that I have received my thousand acres of land from the estate of John Sims, to make me equal in land advanced by said dec'd to his elder children. This 5th of April, 1867." Said land was received in 1862, during intestate's life. " Received of G. R. Sims & C. W. Sims, administrators on the estate of John Sims, late of Oglethorpe

county, one thousand acres of land, making me equal to the other legatees in land given off in said John Sims' lifetime. The said land being given by commissioners appointed by the Court of Ordinary, for the purpose of making Martha Sims equal in lands. Also five thousand dollars in cash, to make Martha Sims equal in money given to the other legatees or children in John Sims' lifetime. Also two beds and furniture, one horse, bridle and saddle, two cows and calves, one thousand pounds of pork. All of the above received by G. R. Sims and C. W. Sims, administrators of John Sims, late of Oglethorpe county, for the purpose of making Martha Sims, widow of John Sims, equal to the other legatees given off during his lifetime. Jan'y 4th, 1866.

Her<br>
MARTHA ⋈ SIMS.<br>
mark.

" Test.    WM. G. SIMS."

" Rec'd of C. W. Sims and G. B. Sims, administrators on estate of John Sims, five thousand dollars for money advanced the other legatees during the lifetime of said John Sims. Also two beds and furniture, one horse, bridle, and saddle, two cows and calves, one thousand pounds of pork. The above makes C. W. Sims equal in money and the other articles mentioned, up to the present date.    C. W. SIMS.

" January, 4th, 1866.

" Test.    WM. G. SIMS."

The widow's dower has been assigned, and no objection is made to it. He prayed for a decree framed so as to pay counsel fees and expenses of distribution, and then to divide the estate, (except the lands,) into six equal shares, and that the proceeds of the land, (except the dower lands,) be divided into six equal shares, and that one share be given to each of the six claimants.

Charles W. Sims answered, admitting the statement of the bill, and praying that the advanced heirs should be charged with the value of the advancements, at the dates of advancements, before they should take any part of said estate. He

stated that there was no contest between the claimants, except as to the negroes. Martha Sims answered, and made, for herself, the same claim and statement made by Charles W. Sims.

When the cause came on for hearing, all the parties admitted that the statements in the bill and answer of George R. and Charles W. Sims were true, and said answers were adopted as the answers of the other defendants. " It was admitted that John Sims died in 1864, in the latter part of the year, and his administrators qualified soon after; that there were no debts against the estate ; the administrators and heirs met for distribution in 1865, when the negroes were worthless, by reason of the events of the war, and the unadvanced heirs were offered the negroes, but did not consent to receive them, as they were valueless."

After argument, it was agreed that the Chancellor should decide the questions arising on this state of facts, and that either party might sue out a writ of error to the Supreme Court. The Chancellor decided that those to whom negroes had been advanced should account for them at their values at the dates of advancements, without hire or interest; that as the negroes held by intestate at his death, had been emancipated, they should not be reckoned in estimating the estate for distribution.

George R. Sims, as administrator, and the advanced heirs assign said decision as erroneous.

(This cause was twice continued here because of illness of counsel.)

B. H. HILL, (by the Reporter,) for the plaintiffs in error.

MATTHEWS & REED, TOOMBS & DuBOSE, for defendants, cited Irwin's Code, secs. 2538, 2541–2; Harris vs. Allen, 18 Ga. R., 180 ; Hand vs. Armstrong, 34 Ga. R., 232 ; Bass vs. Ware, 34 Ga. R., 386 ; Freeman vs. Bass, 34 Ga. R., 363.

McCay, J.

1. Our Code, sections 2538 to 2542, settles, with precision, that a child, who has received advancements, shall account for them if he proposes to come in as a distributee, and that advancements shall be estimated at their *value at the time they were received*, unless there was a value fixed at the time, by agreement. The fact that an advancement has become valueless, by destruction, or death, or emancipation, since it was received, or that it has, by growth, or by appreciation, become more valuable, has nothing to do with it. Indeed, it would seem to be the express intent of the statute to settle this very matter, as it does, by enacting that the value of the advancement, at the time of its reception, is the criterion: Code, sec. 2542. We see no difference between the loss of a slave by death, or his depreciation in value, so as to be worth less from sickness, and his loss by the act of the government— by emancipation. It is true that the sudden emancipation of the slaves of the State, by the results of the late war, has, as to this kind of property, made the law of the Code, perhaps, an unjust one. The whole advancement has been lost, and the estate out of which the heirs are to get their portions, has suffered in the same way. So that it now often occurs that an advanced child has to account for an advancement, while those who have not been advanced, and who have lost their share of an estate by emancipation, gets compensation in other property. Several such cases, as well as the present, have come under my observation. We are inclined to think that this rule, prescribed by the Code, needs some modification, to meet the extraordinary circumstances in which we now find ourselves. But this modification is not the business of the Courts. The Code is plain and positive, and, as a general rule, experience proves that it is wise and just. And if the anomalous state of things produced by emancipation, has, as we think, in the main, true, made the rule, to some extent, unjust and inequitable, the remedy is with the Legislature, and not with the Judiciary. A Court has no power to mould the rules of law to suit the changed circumstances

Sims *et al.*, *vs.* Sims *et al.*

of the country. We, therefore, are constrained to obey the law, although in this, and, perhaps, in many other instances of advancements of slaves, it is not strictly equitable. If a remedy is needed, it is for the Legislature to supply it.

2. If one die without a will, the law provides how his estate shall be distributed, and nothing is a will that does not comply with the requirements of the statute. A memorandum of the intestate, no matter how clearly proven, his dying words, in the presence of all his family, no matter how just, unless it can be proven as a will, can receive no notice from the Courts.

To allow these memoranda, kept by the testator, perhaps with great care and fairness, to point out how his estate shall be distributed, would be to repeal the whole law on the subject of wills and the distribution of estates. The deceased died testate, or intestate. If the former, his will must be probated according to law. If the latter, then the law points out the mode of distribution, and his wishes have nothing to do with it.

Suppose the book kept by him had said in express language, " I wish my children to be equal at my death, and that my estate shall be divided in kind, giving each of the heirs not advanced, specific articles, such as the advanced children have gotten, and this without regard to the value of the articles." This would clearly be a will. It would dispose of his property differently from the disposition made by law.

Shall we do, by inference, that which we could not do, had the testator directed, in words, not executed as a will? Clearly not. The statute prescribes the effect of these memoranda of advancements. 1st. They are evidence of the fact of the advancement. 2nd. They are *prima facie* evidence of its value. But they are not a will, and they can have no force as a will, because not executed as the law requires: Code, 2539.

3. The Code, section 2542, provides that the advancements shall bear interest from the time of the first distribution. This is directed to take place in twelve months from the administration. Clearly, therefore, the first distribution is the time fixed by law for estimated the value of the advance-

ments, and the value of the estate. What the estate is worth, at that time, after paying the debts, added to the advancements brought in, and the whole divided by the number of distributees, is the share of each.

Judgment affirmed.